IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:20-CR-473 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD WOODARD, JR., | ) | SENTENCING MEMORANDUM |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through its attorneys, David M. Toepfer, United States Attorney, and Margaret A. Sweeney and Vasile C. Katsaros, Assistant United States Attorneys, and hereby files this Sentencing Memorandum requesting that the Court impose a sentence of 222 months of imprisonment, for the reasons stated herein.

I.      **Factual and Procedural Background**

In the summer of 2020, Richard Woodard was selling fentanyl in the City of Cleveland. One of his customers, C.M., died on July 28, 2020, after communicating with Woodard that morning. Later investigation revealed that a baggie of fentanyl mixture in C.M.'s pocket had Woodard's DNA on the zipper of the baggie. That day, C.M.'s son, who was also one of Woodard's customers, contacted Woodard after he learned of his father's death. After phone calls back and forth between C.M.'s son and Woodard, C.M.'s son texted Woodard and told him not to worry because "they don't think it was an od [overdose]." Undeterred by this seemingly close call that his drugs may have killed one of his customers, Woodard continued to sell fentanyl to his customers in Cleveland, including C.M.'s son.

On August 7, 2020, Woodard left his twelve-year-old son to play video games in his apartment as Woodard went out to sell drugs. That day, Woodard sold fentanyl to one of his

customers, Laura Smith.  Shortly after that sale, Woodard was arrested, and in his car, officers found several baggies of fentanyl that Woodard had ready to sell to more customers.  When Woodard left his son in the apartment that day, he also left several loaded firearms scattered throughout the apartment, one of which was a high-powered rifle that sat atop the sneaker collection that Woodard had in his bedroom.  Woodard also had a small drug lab set up on a folding table in the room, where he mixed and prepared his fentanyl for sale.  The drugs found on this table were similar mixtures to the drugs that Woodard had distributed on July 28, 2020, that were found in C.M.'s pocket when he died.  They were also similar mixtures to the fentanyl that Woodard sold to Smith on August 7, 2020, and that he had in his car when he was arrested.

After Woodard was arrested on August 7, 2020, he spoke with Detective John Graves and told him that his 12-year old son was in the apartment with drugs and guns.  Officers went to Woodard's apartment and secured his minor son, who was sitting within reaching distance of another high-powered rifle that was leaning against a television in the living room.  Woodard was later indicted for possessing the drugs and guns in his apartment, and for distributing the fentanyl to C.M. on July 28, 2020, and distributing fentanyl to Smith on August 7, 2020.

Following his indictment, Woodard moved to suppress evidence seized from his apartment.  During the suppression hearing, Woodard testified and attempted to persuade this Court that the information Detective Graves put in the search warrant for Woodard's apartment was false.  Specifically, Woodard claimed that he did not distribute drugs to Laura Smith on August 7, 2020.  Instead, Woodard claimed, he was giving her money for scrap metal.  (R. 100: Supp'n Hr'g Trans., PageID 575-77).  At trial, Laura Smith testified that Woodard gave her drugs that day, and she identified text messages between she and Woodard supporting that she

was a frequent drug customer of Woodard's. The jury also found that Woodard had distributed drugs to Smith on August 7, 2020, convicting him of Count 2.

Despite testifying to the contrary at his suppression hearing, at trial Woodard admitted through counsel to selling the drugs to Smith on August 7, 2020. He also admitted that he possessed the drugs and guns in his apartment. However, Woodard's attorney argued that Woodard did not distribute drugs to C.M. on July 28, 2020, and he denied possessing any of the guns in his apartment in furtherance of his drug trafficking. Nevertheless, the jury convicted Woodard of all counts, finding that Woodard distributing drugs to C.M. *did not result* in C.M.'s death.

Woodard, now standing convicted, faces mandatory minimum sentences for Count 3, for possessing more than 40 grams of fentanyl in his apartment, and for Count 5, for possessing a firearm in furtherance of a drug trafficking crime. The sentence for Count 5 must be served consecutively to any other sentence imposed. 18 U.S.C. § 924(c)(1)(A)(i).

**II.     Law and Argument**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Appellate courts must review a district court's sentence for procedural and substantive reasonableness. *Id.* at 51. Although the Guidelines are advisory, appellate courts may apply a presumption of reasonableness to a sentence that falls within the Guideline range. *Id.*

    A.     <u>Advisory Guidelines Calculation</u>

The government does not object to the final presentence report issued on August 6, 2025. (R. 155: Final PSR, PageID 1181-1211). The report calculates the base offense level as 28, calculating all the fentanyl mixtures as fentanyl analogue with a 10,000:1 ratio, pursuant to

3

U.S.S.G. § 2D1.1.  However, the United States submits that the more appropriate base offense level is 24, which calculates all the fentanyl mixtures using the fentanyl ratio, rather than as a fentanyl analogue.  Each of the mixtures referred to as fentanyl analogues in the report contained 4-ANPP.  This substance technically qualifies as a fentanyl analogue under the definition of such in the Guidelines because it has a "chemical structure that is similar to fentanyl."  § 2D1.1, Drug Quantity Table, n. (J).  Although 4-ANPP's chemical structure is the same, its pharmacological effect on the human body is lower than fentanyl.  In other words, 4-ANPP as a substance is less powerful than fentanyl.  For this reason, the United States submits that the more appropriate conversion for these substances is to calculate them using the fentanyl ratio of 2500:1.  Using this lower ratio, the base offense level is 24, with the converted drug weight of 376.6 kilograms.  With this base offense level, the United States requests that the Court impose a sentence at the high-end of the range that results from the below calculation:

| **Counts 1, 2, 3, 4, and 6** | | |
|---|---|---|
| Base Offense Level | 24 | §2D1.1(a)(5), (c)(8) |
| Maintaining a Drug Premises | +2 | § 2D1.1(b)(12) |
| Obstruction of Justice | +2 | § 3C1.1 |
| **Total Offense Level** | **28** | |
| **Count 5:** 18 U.S.C. § 924(c)(1)(A)(i) | 60 months consecutive | § 2K2.4 |

The United States also agrees with the criminal history score calculated in the report, which places Defendant into a Criminal History Category V.

Using the above calculation, which results in an adjusted base offense level of 28, the advisory Guidelines range is 130-162 months of imprisonment.  In addition to this range, the sentence for Count 5, the § 924(c) count, has a mandatory minimum 60-month sentence that must run consecutively to any sentence imposed from the above range.  Consequently, the total adjusted range, accounting for this additional 60 months, is 190-222 months.  The United States

4

asks that the Court impose a sentence at the high end of that range—222 months of imprisonment.

### 1. Defendant Should Not Receive an Acceptance of Responsibility Reduction

Woodard has argued in his sentencing memorandum that he should receive a reduction for acceptance of responsibility based on his admitting to the jury that he possessed the drugs and guns in his apartment and sold the drugs to Laura Smith on August 7, 2020. To obtain a two-level reduction for acceptance of responsibility under § 3E.1.1, a defendant must "clearly demonstrate[] acceptance of responsibility for his offense." U.S.S.G. § 3E.1.1. If the defendant receives such a reduction, he may also receive an additional point reduction if the government moves for the reduction based on the defendant having "timely notif[ied] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." *Id.* Woodard has not accepted responsibility in this case, and he is not entitled to a two-level reduction. Additionally, the government will not be moving for a third level of acceptance, even if this Court was to grant Woodard a two-level reduction.

Generally, defendants who proceed to trial are not eligible for an acceptance of responsibility reduction. *See United States v. Henderson*, 307 F. App'x 970, 982 (6th Cir. 2009). Although there are "rare situations" where a defendant may be entitled to such a reduction after trial, "[i]n each such instance . . . a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." *Id.* (quoting U.S.S.G. § 3E1.1, cmt. 3 (internal quotation marks omitted)). Throughout the pendency of this case, Woodard has refused to accept responsibility for all of his crimes. Indeed, at the suppression hearing, Woodard denied selling drugs to Laura Smith on August 7, 2020. (*See* R. 100: Supp'n Hr'g

5

Trans., PageID 575-77).  Woodard also falsely denied other factual allegations, including the fact that he was Mirandized and made certain admissions to law enforcement.  Indeed, this court found that his testimony was not credible.  (R. 87: Order, PageID 444).  *See Henderson*, 307 F. App'x at 983 (finding that contradictory suppression hearing testimony is "inconsistent with acceptance of responsibility").  Only at the time of trial did Woodard decide to selectively accept responsibility for his conduct.  Woodard admitted to the jury that he was a drug dealer, including that he sold drugs to Smith, despite denying it earlier.  However, Woodard denied selling the fentanyl to C.M. on July 28, 2020, and he denied possessing the firearms in his apartment in furtherance of his drug trafficking.  Additionally, he has not provided an acceptance of responsibility statement to this Court as part of his presentence report; indeed, Woodard refused to cooperate with a presentence interview.  (R. 155: Presentence Report, PageID 1201).

It is Woodard's burden to show that he is entitled to a reduction for acceptance of responsibility.  *See United States v. Banks*, 252 F.3d 801, 806 (6th Cir. 2001).  Woodard has not met that burden.  Although Woodard argues that he admitted to his conduct in Counts 1 through 4 of the Superseding Indictment, he did not admit to his conduct in Count 5 or Count 6.  Indeed, although Woodard admitted to selling drugs in the past to C.M. and C.M.'s son, Woodard denied distributing the drugs to C.M. on July 28, 2020, an argument that the jury rejected when it found Woodard guilty of Count 6.  Additionally, the jury rejected Woodard's argument that he did not possess the firearms in his apartment in furtherance of his drug trafficking crime, finding Woodard guilty of Count 5.  Woodard's choice to partially accept responsibility for some of his crimes does not meet his burden of "clearly" demonstrating acceptance of responsibility for his offenses.  Moreover, Woodard's selective acceptance does not constitute one of the "rare situations" where a defendant who proceeds to trial should also receive a reduction for accepting

6

responsibility. This is even more true in light of the fact that Woodard has refused to cooperate with the presentence report writer or provide a statement to this Court accepting responsibility. Therefore, Woodard should not receive a reduction for acceptance of responsibility.

        2.       *Defendant's Criminal History Calculation*

The United States agrees with the criminal history score calculated in the final presentence report, which places Woodard in a Criminal History Category V.

    B.    <u>Title 18, United States Code, Section 3553(a) Factors</u>

A sentence within the advisory guideline range is appropriate and sufficient but not greater than necessary to comply with the § 3553(a) factors. Pursuant to 18 U.S.C. § 3553(a):

> The court, in determining the particular sentence to be imposed, shall consider:
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence, and the sentencing range . . . ;
> (5) any pertinent policy statement . . . ;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. . . .

18 U.S.C. § 3553(a).

The nature and circumstances of the offenses support a sentence at the high-end of the range as calculated herein. Woodard's offenses involve the repeated distribution and possession of fentanyl and firearms. Although Woodard was not found responsible for causing the death of C.M. with the drugs that he distributed on July 28, 2020, the evidence admitted in trial showed that Defendant knew there was a possibility that he could have been responsible for C.M.'s

7

death.  Specifically, as shown in Government's Exhibit 27 and through testimony, C.M.'s son called and spoke with Woodard multiple times after his sister told him that their father had died. After several calls, C.M.'s son texted Defendant and told him, "They don't think it was an od they didn't find anything."  (Exhibit 29, Line 29, Text Message 7/28/2020 9:14 p.m.).  Even after learning this, knowing how close he may have come to killing someone with the fentanyl he was selling, Woodard did not stop selling fentanyl.  Instead, Woodard continued his drug trafficking, undeterred by the risk that he had just confronted.  Texts between Woodard and C.M.'s son show that Woodard continued to sell drugs to C.M.'s son after his father's death, through August 5, 2020.  Indeed, C.M.'s son texted Woodard on August 3, 2020, stating, "I[] have to go to pops viewing I have 20 please can I see you."  (Exhibit 44).  Only a few days after that, on August 7, 2020, Woodard was arrested after he sold the same fentanyl mixture to Laura Smith.  When he was arrested, Woodard had multiple bags of the fentanyl mixture in his car, all prepared to sell to other susceptible customers.  Woodard's repeated trafficking even after he learned of the possibility that his drugs could have killed C.M. shows that Woodard is a habitual drug trafficker who operates with disregard for the inherent risks of his trade.

   In addition to the risk of death that Woodard posed to his customers, Woodard also possessed high-powered firearms in his apartment, along with two handguns, each meant to defend his drug stash and the money he made from his customers.  Not only did Woodard have these guns strategically placed throughout his apartment to defend his drugs and his drug proceeds, he again ignored the inherent risks of his dangerous behavior and left his twelve-year old son unattended in the apartment with the loaded firearms and fentanyl.  As the evidence at trial showed, these firearms were loaded and readily accessible to his son, who was left alone in the apartment to play video games while Woodard was out selling fentanyl throughout the city.

In addition to the firearms being available to Woodard throughout the apartment, Woodard's drug lab in his bedroom was also exposed and available to his son or whomever walked into the room.  The nature and circumstances of Woodard's offenses go above and beyond a typical drug trafficker because of the disregard Woodard showed for the inherent risks of his conduct, not only to the community as a whole, but also to his own son.

Woodard's history and characteristics also support a sentence within the Guidelines range.  Woodard's criminal history dates back more than 25 years.  His first felony conviction was for first-degree Aggravated Robbery, for which he served four years in prison.  (R. 153: Presentence Report, PageID 1153).  Just a few months after committing that offense, Woodard committed a Breaking and Entering offense, for which he received a 6-month sentence concurrent to the Aggravated Robbery sentence.  (*Id.*).

Woodard was released from the prison sentences for these offenses in September 2001, and he was on post-release control until March 2006.  (*Id.*, PageID 1154).  During that time, Woodard picked up several new offenses, including convictions for Theft and five convictions for Driving Under Suspension.  (*Id.*, PageID 1154-55).  In 2007, Woodard was convicted of a misdemeanor for Furnishing False Information and Violating a Restriction; he received a sentence of 180 days in jail.  (*Id.*, PageID 1156).

Later in 2007, Woodard was convicted of Trafficking Marijuana and Having a Weapon Under Disability.  *(Id.*, PageID 1156).  During that offense, Woodard possessed a firearm in his car with the marijuana he was distributing.  (*Id.*).  Throughout 2007, Woodard continued to pick up misdemeanor and felony convictions, and he received a sentence of two years imprisonment for Failure to Comply with a Police Officer.  (*Id.*, PageID 1156-57).

9

After Woodard was released from that prison sentence, he was again convicted of Driving Under Suspension.  (*Id.*, PageID 1158).  In 2011, Woodard was again convicted of a felony offense for Tampering with Records; he received a sentence of 9 months of imprisonment.  (*Id.*, PageID 1158).  In 2012, Woodard was convicted of Improperly Handling Firearms in a Motor Vehicle, and he received a six-month sentence of imprisonment.  (*Id.*, PAgeID 1159).  Following that conviction, Woodard was fined for an Open Container violation and then convicted and sentenced to 9 days in jail for another Driving Under Suspension.  (*Id.*).

Woodard was then convicted of Trafficking Offenses and sentenced to two years of probation.  (*Id.*, PageID 1160).  In 2015, Woodard was convicted of another drug offense, this time it was Drug Possession; again, he received another probation sentence.  (*Id.*).  Prior to his arrest in this case, Woodard picked up three more Driving Under Suspension cases.  (*Id.*, PageID 1160-61).  Indeed, Woodard was on probation for those convictions when he committed the offenses in this case.  (*Id.*, PageID 1162).  Woodard's long and consistent criminal history show that he has exhibited a disregard for the rule of law throughout his adult life.  Moreover, his criminal history, which culminates in the offenses in this case, shows that Woodard's drug trafficking has been escalating for years.  Woodard's history and characteristics support a sentence at the high-end of the range as calculated herein.

Additionally, a sentence at the high-end of this range would reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the offenses.  Despite multiple convictions since he was 18, the longest sentence that Woodard has ever served has been a four-year sentence for Aggravated Robbery in 1997. (R. 155: Presentence Report, PageID 1190).  These prior convictions did not stop him from trafficking drugs, and they

10

certainly have not promoted his respect for the law.  A sentence at the high-end of the range outlined herein would do what Woodard's prior, lower sentences have not been able to do.

A sentence at the high-end of this range would also provide adequate deterrence and protect the public from further crimes of Woodard.  His repeated criminal conduct shows that when he is released from prison, he cannot follow the law or conform his conduct.  A sentence of 222 months will remove Woodard from society, protecting the community from his repetitive criminal conduct.

### III. CONCLUSION

For the foregoing reasons, the government requests that this Court impose a sentence of 222 months, as outlined in this memorandum.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

By:  /s/ Margaret A. Sweeney
Margaret A. Sweeney (OH: 0086591)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3990/3995
(216) 522-7499 (facsimile)
Margaret.Sweeney@usdoj.gov